You can proceed. Well, first of all, Mr. Sholom, would you like to reserve any time? Two minutes, Your Honor. Two minutes, very good. You may proceed when you wish. May it please the court, good morning. We have two petitions before the court this morning. One petition deals with the substantive denial of asylum for the Zafir family that I represent. This petition also is accompanied by another petition that came by way of a motion to reopen that was filed before the Board of Immigration Appeals based on ineffective assistance of counsel of the Zafir's former counsel that handled their matter before the immigration court and at the appellate level before the Board of Immigration Appeals. I'm going back to the substantive petition of the first petition that's before the court. The Zafir family, Mr. and Mrs. Zafir, Mrs. Zafir was born in Uzbekistan. She moved to Israel and was granted status and lived in Israel for about nine years. And her husband, who's from Georgia of Russian descent, also moved to Israel, was granted status. He's of Russian descent, but Christian. Mrs. Zafir is Jewish, but is a Sabbatarian, or they're Messianic Jews. They believe in Jesus Christ. During the course of the years that they lived in Israel, they had several issues and problems that were presented to the immigration court. Since we have so little time together, can I just cut to the heart of a few things that I'd be interested in knowing your response? As you well know, persecution is defined in our circuit as being an extreme concept marked by infliction and suffering of harm, usually of physical harm. That is as opposed to, say, racial slights, slurs, discrimination, things of that nature. I have, of course, read your petition. And I look at the things that you have alleged. So far as I can tell, there's no physical violence anywhere here. Have I missed something? Your Honor, this case involves cumulative harm. And there actually was physical violence involving Mrs. Zafir's child at the nurses. I understand. She was beaten repeatedly. Well, as I understand it, I don't know about the repeated part. Their allegation was that he came home with some bruises and that the school, according to the record, the school looked into it right away. Sadly, the problem of bullying and things of that nature in schools is not unique to Israel or anywhere else. And many parents worry about that kind of thing. And as sad as I feel about that, I'm Again, not harassment, not discrimination, but persecution in the sense of physical violence, serious, extreme kinds of things that what I read about the wives of the rabbis coming over and harassing her, as uncomfortable as it was and perhaps uncalled for as it was, I'm having difficulty seeing where that rose to the level of persecution as defined by our circuit. Well, Your Honor, not only the rabbis were coming by, but they also threatened to burn down the house. They didn't do that, right? They did not, but the threat of violence and the throwing of rocks and breaking up the windows around the child's head. OK, now that information came in with the brother, Benjamin, I believe. Did it not? No, Judge. It did came through Benjamin, the father or the husband of the lead petitioner. However, it was also in the substantive case that went before the IJ that glass was broken and they did find glass around the baby. OK, I hope you understand. I am not trying to make light of this in any way. I'm sure it was horrifying for these folks. I'm trying to understand, based upon the standards that our circuit has set for persecution, was the baby physically injured in any way by the glass? No, there was no injury. And Judge, I fully understand your questions and your concerns. The problem we have here is, had this case been properly presented to the IJ, all these issues would have been addressed. For example, the niece having the nose broken, there's a bit of information about that. But there's no information in there about why it happened, whether any action was taken, how it happened. Let's go to that. You've been good enough to provide for us, as you are required to do under Lozano, a copy of the letter that the former counsel presented to the BIA. And I gather you stipulate the BIA had that before them, right, when they made its decision? Yes, Your Honor. OK. She indicates that she had reviewed all this information extensively with your client. Some of the information that is now being stated was not provided to her. She also indicates that she didn't put Benjamin on the stand because he wasn't persecuted. That in fact, she worried that as a matter of strategy, that the very thing that I'm concerned about here would happen. That instead of it being treated as persecution, it would be treated as harassment. So there was a lot of trial strategy. By any measure, the former counsel was an experienced immigration lawyer. I personally am kind of caught on the horns of a dilemma here. We have so many people that represent immigrants in the court who are, with all due respect to some of them, they're really incompetent. Whereas this woman was of an experienced person. To have her accused of being ineffective, you've got a burden there. You've got a really heavy burden. And if you read her letter, I'm troubled by the allegation. So I would like you, if you will please, to address why her statements to the BIA as to why she feels there was no, far from being ineffective assistance to counsel, that she went over backwards based upon the resources that these folks had, even advancing some herself, to present the best case she possibly could. Your Honor, then let's start with the fact that these Petitioners had filed their asylum application pro se. Even this Court has indicated that asylum applications that are filed pro se, the immigration judge should be charitable in allowing some room here. When this counsel, the former counsel, took over this case, she made no effort whatsoever to supplement, amend, correct, ameliorate that asylum application. Her role, she thought, was to simply represent these folks for trial. And that is not the role of an immigration attorney who's experienced. You have to look at the letter. That's not what she says. I understand you're an advocate, and I understand that's how you're characterizing it. She even says that with the allegation that she did not supplement or do anything further, she said that it was already provided. Your Honor, this counsel provided zero country conditions information. She did not ameliorate or supplement. I thought she provided the country report. I believe the court, the immigration court, has a policy when they set a case for trial and they accept an application for asylum. They enter into the record the country information. Forgive me, you've got your two minutes left. Do you want to save that? Yes. OK. If you don't mind, then we'll hear from the government. May it please the court. Thomas Viteros for the Attorney General. The record does not compel the conclusion that confrontational visits from rabbis' wives, rocks being thrown at a house, or preschool bullying constitute persecution. As the court has outlined, these are distasteful, prejudicial acts, but they do not rise to the level of persecution. Similarly, petitioners have failed to demonstrate the board abuses discretion in denying their motion to reopen because their counsel did provide effective counsel to them and they have been unable to show any prejudice in this matter. Taking first their asylum claim, their asylum claim failed for three fundamental reasons. First of all, the acts the petitioner described did not constitute persecution. While wholly uncondoned, they constituted harassment. Secondly, and very importantly, the petitioner was unable to demonstrate any type of state action. In fact, the government of Israel, on three occasions, moved the family to different locations. Third, the petitioner's family, much of her family, continues to live in Israel and work in Israel. Her mother and father receive government health care. Her father receives a government pension. Her brothers and sisters work in Israel, including serving in the Israeli military. These three factors provide substantial evidence in support of the board's decision. But now, she alleges that if Binyamin, wasn't that the name of her husband, was it? Her husband, yes. And if Binyamin had been, am I pronouncing that right? Binyamin. Binyamin. Well, I'll go with Binyamin. It's easier for me. Anyway, if he had been presented as a witness, he could have said that these people who were continuing to live in Israel were not living there peacefully and without difficulties. And that would have cut against what you just said. And also, he would have buttressed, I guess, her testimony to make it more believable or something of that effect. Your Honor, I think it's very important to look at the actual statement from Petitioner's husband, which is not mentioned in the brief, no substantive discussion in Petitioner's brief, about what he would have testified to. Yes. I believe that there is testimony or there is statements in there that the family, there is some harassment at times when they go to services, and there's the same type of harassment that Petitioner described. And the government forced the PrEP or whatever it is, that group they belong to. He had stopped providing assistance to that group. Am I right? I may have got the wrong place. As Petitioner, these are all things that Petitioner testified to. There was an issue with the second settlement that she went to that there were some sort of news reports that caused the community to lose some benefits. And then they had some trouble in the community. And they went to the government of Israel and said, please move us. And they moved them to a different town. If you look at the testimony from Petitioner's husband, he once again describes discrimination, specifically talking about going to work and being asked to do distasteful jobs and often working with individuals that he couldn't communicate with. Again, this type of harassment or religious bigotry is wholly uncondoned, but rather is just cumulative. It's cumulative. I don't want to say just. It's cumulative evidence of discrimination. And we have turned to the ineffective assistance claim. And it's more than just saying, you didn't provide a testimony from my husband or you didn't provide an expert. It's important and it's incumbent upon the court to look at what that testimony would have been. And in measure, it is cumulative evidence of this type of harassment. There are conflicts in Israel. I think we'll get to it in the next argument where we have some more information in the record. Between this, there's a group of ultra-Orthodox Jewish in many ways settlers in these villages that do not believe that immigrants such as Petitioner should have been permitted to enter Israel. And that has manifested themselves in protests and often distasteful statements. However, that's not persecution. And more evidence of that does not show ineffective assistance. As the court has pointed out, the record demonstrates that Petitioner's attorney was fully and elicited a complete recitation of what, in fact, happened to the Petitioners in Israel. This is not ineffective assistance. I have a question I'm hoping that you or your opposing counsel can help me with. One of the allegations against former counsel is that she did not provide an expert witness. Expert witnesses cost money, usually. What is the standard in our circuit, or for that matter, any circuit that you're aware of that would require a counsel in order to be effective to provide an expert witness out of his or her own pocket if the client cannot or will not pay for that expert? Your Honor, that is a more loaded question than maybe you even realize. As pointed out in our brief, Petitioners do not maintain a constitutional right to counsel. Even looking at the proceedings here, what they received was in accordance with all applicable regulations, and they received a full and fair hearing in front of an asylum officer and immigration judge on the board. What they're claiming here at the outset when it comes to the expert testimony is that not only does the Constitution require effective assistance, but that the only way that their hearing could have been fundamentally fair was with the provision of an expert. Well, there are no standards for that, because there is no such requirement. Importantly, this would go against what this Court has continuously said, that asylum applicants can make their case and regularly make their case by presenting evidence of what happened to them, what they saw in their country, what they experienced. And that, as their former counsel pointed out, is can be complete evidence of an asylum claim. And the idea that the Constitution requires an expert to bolster that is not supported in this Court's jurisprudence or anything. There's no case law anywhere, is there, that says that there is a requirement, certainly not a constitutional requirement, to provide an expert? Not a constitutional requirement, no regulatory requirement. Or indeed, there is not even a constitutional requirement that counsel be provided. No, no. We have a regulatory opportunity to obtain counsel. By the way, Mr. Petros, you submitted a 28-J letter on some matters pending before the Attorney General. Yes, I did. On this right to counsel. Anything happen in those proceedings? Nothing has happened. As I think counsel for the other petitioner pointed out, these are still pending cases. And it is out of candor with the Court that I wanted to tell the Court that the Attorney General is looking at these issues and to come up with a decision about whether there is a constitutional right and possibly whether there's an administrative remedy. And I think the appropriate way to look at these types of claims is through the guise of the regulations and what is provided to aliens. They're provided that hearing through these regulations provide the opportunity to come before an asylum officer, an immigration judge, and a board. Let me turn to a different subject now. There's a claim that the BIA didn't address the voluntary departure issue at all. Now, your position in the brief is that, well, there's no jurisdiction to review it. But suppose we take the view that, well, you're correct as far as, say, reviewing the merits of a voluntary departure determination. But I think the complaint here is that that issue was never addressed. Isn't that right?  You don't address the merits of that. Doesn't the board have the obligation to address a claim that's made to it? The board has an obligation to issue a decision. The agency has an obligation to issue a decision. And what you pointed to is a claim that the board has not articulated a complete recitation of their decision. It didn't make it. Well, it didn't say a word about voluntary departure. But they did incorporate the IJ's findings, did they not? They did. And what is before this court right now is a decision, the decision of the agency that these Petitioners are not entitled to asylum and are not, and arguably, before this court would be, that they're not entitled to voluntary departure. Well, now, just a minute. Now, what do you mean by arguably? Well, I would say the court does not have jurisdiction to review that. Well, it depends on what you mean by arguably they're not entitled to voluntary departure. How do you get to that conclusion? That arguably they are not entitled. What I'm, what I was saying is that the court, the board, and the agency has made a decision that they do not get voluntary departure. The agency made a decision? The agency made a decision. The immigration judge denied it. They appealed this to the board. The board issued a decision affirming the conclusions of the immigration judge. And it's specifically an area in which the court does not have jurisdiction to review. The, what is before this court is the decision of the agency. The decision of the agency is clear that their applications were denied. There's an entire record before this court. And you have a petitioner that is able to bring forth elements of this record that could cause this court to overturn the decision. This is not a decision that incorporates, you know, it's not one, it's not a streamlined decision, right? It's not the kind of decision that, you know, incorporates 100% the decision of the immigration judge. So if it's not that kind of decision, it doesn't have the board, it meaning the board, have the obligation to address the contention made that, you know, that the IJ erred in denying voluntary departure? If I may respond. Yes. The idea that the court, the board has some sort of articulation requirement is not supported in the regulation. It is not supported in the statute. So first the court would have to come up with this obligation and then come up with a reason to say that the board has not met that. It is clear that these petitioners' applications were denied. There's a record for why they were denied. And simply failing to articulate the rationale behind that denial or responding to arguments is not in itself a statutory or constitutional error. So your position is, when it makes a, this is a Bourbon type decision, isn't it? This one here. It is a Bourbon edition where it seems like they're noting certain things that they're more emphasizing. See, that's the problem. They talk about certain things, so you know they're not adopting the IJ's decision, although they do reference Site Bourbon, right? They adopted the conclusions. But so your position is that the proper way to read that is that they're adopting the IJ's conclusion that the petitioners aren't entitled to voluntary departure. And if that's what they did, then we can't review that. Yes. All right. I just wanted to thank you. Thank you, counsel. You have your time for rebuttal now, sir. A couple of points. Your Honor, former counsel before the BIA indicated that the petitioner's family's siblings were granted refugee status in the United States. I have not been able to find anything in the record to support that. But that goes to the heart of the effective representation of a former counsel, Your Honor. It is important, if counsel makes a representation before the BIA, which is material, that the petitioner's siblings were granted refugee status in the United States, that would be material information that would be important before an IJ. Now, there's nothing in the record. Do you have that, had that information been presented, that it would have made a difference in this case? It would have made a difference because family members who were granted refugee status in the United States, they had gone through that process to prove that they were refugees. That would be material evidence in their trial to show that family members' siblings were, in fact, persecuted in Israel. So that would have been absolutely material. The other issue is that the court indicated whether or not the threats of violence, the threat of burning down the house ever material, is where, in fact, Mr. Zafir, in his declaration in support of his asylum application that was provided to the BIA as part of the motion to reopen, indicated, he did say there, that the storage area of the house was set on fire, and Mrs. Zafir had put it out. Had former counsel gone through thoroughly a pro se application before trial and amended that application and brought to light these additional information and allowed Mr. Zafir to testify, these issues would have come forward. But that didn't happen. And then now we're stuck with the decision of the IJ, Your Honor, where specifically the extra information about what happened was the grounds to find Mrs. Zafir not credible. I apologize for having to interrupt your advocacy, but the time is exhausted. And we thank both of you. Thank you. The case just heard is submitted. And we will now hear argument in Notchev, I apologize for the pronunciation, versus Mukasey.
judges: Thompson, Tashima, Smith